UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

RICHARD GUERTIN,

                              Plaintiff,

        -v-

UNITED STATES OF AMERICA, DEPARTMENT
OF HOUSING AND URBAN DEVELOPMENT,

                              Defendants.

Case No. 11-CV-4661 (KMK)

OPINION AND ORDER

Appearances:

Robert N. Isseks, Esq.
6 North Street
Middletown, NY 10940
*Counsel for Plaintiff*

Michael J. Byars, Esq.
Office of the United States Attorney
Southern District of New York
86 Chambers Street
New York, NY 10007
*Counsel for Defendants*

KENNETH M. KARAS, District Judge:

        In 2004, Plaintiff Richard Guertin ("Plaintiff") was the Corporation Counsel for the City

of Middletown, New York.  AR 126–49.[1]  On August 30 of that year, Plaintiff was indicted —

along with Middletown Mayor Joseph DeStefano ("DeStefano") and Middletown Community

Development Director Neil Novesky ("Novesky") — for allegedly committing a variety of

offenses prohibiting official misconduct.  AR 126–49.  The charges stemmed from a series of

--------

[1]  As explained below, the Court here is reviewing an informal agency determination.  As
such, record references are to the "Administrative Record," abbreviated "AR."

transactions involving Middletown's use of funds it received from Defendant Department of Housing and Urban Development ("HUD") as part of a Community Development Block Grant ("CDBG"). AR 126–49. Plaintiff was charged in eight of the counts contained in the 55-count indictment. AR 126–49.

Ultimately, Plaintiff and his co-conspirators were found not guilty on all counts.[2] Novesky's attorney then asked HUD if federal regulations allowed Middletown to reimburse Novesky for the substantial legal fees he accrued in defending against the criminal charges. AR 42–45; 54–55. A HUD official replied that the reimbursement was permitted. AR 38–39.

Naturally, Plaintiff and Mayor DeStefano then asked HUD the very same question regarding reimbursement from HUD funds for *their* legal fees. AR 34–36. But, to their apparent surprise, HUD denied their request. AR 25–27. According to HUD, the actions that led to the state criminal prosecution of Plaintiff and Mayor DeStefano were "of a personal nature," whereas Novesky's actions had been "undertaken in the ordinary course of the employee's position." AR 25–26. Reimbursement for legal expenses was available in the latter case but not the former; hence, the different determinations by HUD. AR 25. After being stymied in his later attempts to get HUD to reconsider its decision, Plaintiff filed an action in this Court alleging, among other things, that HUD's determination to deny reimbursement was impermissibly arbitrary. (Compl. ¶ 24.) Both Parties have moved for summary judgment based on the administrative record.

_____

[2] The case went to a bench trial, and the trial judge found Plaintiff and Novesky not guilty on all counts. AR 79–125. The judge found Mayor DeStefano guilty of two minor offenses, but the convictions on those counts were reversed on direct appeal. *See People v. DeStefano*, 846 N.Y.S.2d 375 (App. Div. 2007). Thus, in the end, all three alleged co-conspirators were cleared of all criminal charges.

<u>I. Background</u>

<u>A. The CDBG Program</u>

The CDBG program originated under the Housing and Community Development Act of 1974, which Congress enacted to promote "the development of viable urban communities, by providing decent housing and a suitable living environment and expanding economic opportunities, principally for persons of low and moderate income."  42 U.S.C. § 5301(c).  HUD is authorized to provide grants under the CDBG program to states, tribes, and local governments to carry out activities in accordance with the statute.  *Id.* § 5301 *et seq.*  After the federal government makes a CDBG grant, "the day-to-day administration of the federal program, including the actual expenditure of federal funds, is delegated to State and local authorities."  *Dixson v. United States*, 465 U.S. 482, 486 (1984).

By regulation, HUD has imposed specific criteria for determining whether a particular activity is eligible for assistance through CDBG funds.  *See* 24 C.F.R. § 570.200(a).  As relevant here, the regulations state that all costs incurred must conform with OMB Circular A-87, which is called "Cost Principles for State, Local, and Indian Tribal Governments" ("OMB Circular").  *Id.* § 570.200(a)(5).  The OMB Circular "establishes principles and standards for determining costs for Federal awards carried out through grants, cost reimbursement contracts, and other agreements with State and local governments."  *See* Office of Management and Budget, "OMB Circular A-87 Revised," May 10, 2004, http://www.whitehouse.gov/omb/ circulars_a087_2004 (last visited Dec. 17, 2012).  HUD has authority to review a grant recipient's use of its CDBG funds to ensure compliance with federal law.  *See* 42 U.S.C. § 5304(e).

B. The Prosecution of Plaintiff, DeStefano, and Novesky

From 1997 until at least August 2004, Plaintiff was the Corporation Counsel, or "City Counsel," for Middletown, New York; DeStefano was the Mayor of Middletown; and Novesky was Middletown's Community Development Director. *See* AR 100. On August 30, 2004, all three men were indicted in New York County Court, Orange County, on various public corruption charges in a 55-count indictment. *See* AR 126–149. Mayor DeStefano was named in 53 of the counts; Novesky in 23; Plaintiff in eight. *See* AR 126–49.

In particular, the indictment charged with Plaintiff with:

**1.** Defrauding the government by acting individually and in concert with DeStefano and Novesky, "to obtain property from the state or a political subdivision of the state or a governmental instrumentality within the state by false or fraudulent pretenses, representations or promises" (Count 1, in violation of N.Y. Penal Law § 195.20);

**2.** Engaging in prohibited conflicts of interest, by acting in concert with DeStefano, who "knowingly and willfully ha[d] an interest in a contract with the municipality of which [DeStefano] was an officer or employee, when [DeStefano] . . . had the power or duty to negotiate, prepare, authorize or approve the contract or authorize or approve payment thereunder, audit bills or claims under the contract, or appoint an officer or employee who has any of the powers or duties set forth above" (Counts 37, 40, in violation of N.Y. Gen. Mun. Law §§ 801, 805);

**3.** Engaging in official misconduct, by acting individually and in concert with DeStefano and Novesky, with "intent to obtain a benefit or deprive another person of a benefit, [by] commit[ting] an act relating to their offices but which constitute an unauthorized exercise of their official functions, knowing that such act was unauthorized" (Counts 38, 41, in violation of

4

N.Y. Penal Law § 195.00);

**4.** Engaging in a prohibited conflict of interest by "knowingly and willfully hav[ing] an interest in a contract with the municipality of which he was an officer or employee, when he . . . had the power or duty to negotiate, prepare, authorize or approve the contract or authorize or approve payment [thereunder], audit bills or claims under the contract, or appoint an officer or employee who has any of the powers or duties set forth above" (Counts 39, 42, in violation of N.Y. Gen. Mun. Law §§ 801, 805); and

**5.** Engaging in a conspiracy with DeStefano and Novesky with the objective of causing DeStefano "illegally [to] receive an interest in the proceeds of various [HUD] loans administered through the City of Middletown, [none of which was] taken out in . . . DeStefano's name." The charge went on to state that it was Plaintiff's "role in the conspiracy to draft agreements between Mayor DeStefano, his corporation, and the named recipients of loans administered through the City of Middletown, and to prepare legal papers associated with the loans, such as mortgages and UCC Security Chattel Agreements in [Plaintiff's] capacity as Corporation Counsel for the City of Middletown" (Count 55, in violation of N.Y. Penal Law § 105.05). *See* AR 127, 139–49.

The case proceeded to a bench trial in New York County Court, Orange County. Following trial, the judge issued an oral verdict, in which he described his reasoning in finding Plaintiff not guilty on all counts. AR 91–125. The judge also found Novesky not guilty on all counts, and he found DeStefano guilty on only two minor counts, both of which were later reversed on appeal. *Id.*; *see also DeStefano*, 846 N.Y.S. 2d at 375.

Though the trial judge's oral verdict does not fully explain the nature of the case, and the trial transcript is not in the record, what is clear is that the prosecution arose from a series of loans involving the three defendants. AR 97–98. Following a brief legal analysis, the trial

judge's verdict stated that "every single loan under every one of these counts . . . [was] properly considered, and [was] properly granted." AR 97–98. Next, the trial judge stated that he was "urged to accept the proposition that this nefarious cabal existed in the City of Middletown that made all this possible," but "if these defendants are presumed innocent, which they all must be, then the ability to see or fathom a conspiracy is not so clear." AR 98–99.

Turning first to Novesky in particular, the trial judge found that there was "no credible evidence that [Novesky] was involved in any illegal scheme to aid or abet anyone else to obtain any benefits that they were not otherwise entitled to." AR 100. Instead, as best the court could tell, Novesky "did his job," and nothing more. AR 100.

Next, the trial judge described one "troubling transaction in this case." AR 102. The details of that transaction are not entirely clear from the limited administrative record,[3] but the trial judge stated this was a loan which "ostensibly was for the building 5-11 North Main Street for the purpose of making it saleable." AR 103. The third party involved in the loan "was aware of and intended to use the services of the [Office of] Economic Development [*i.e.*, the Middletown entity receiving federal CDBG funds], and then came the negotiations with DeStefano." AR 103. Then, crucially, the trial judge said that those "negotiations involved attorney Guertin ostensibly *in his private capacity*." AR 103 (emphasis added). The court stated that the evidence showed that "DeStefano, with the advice of his attorney [i.e., Plaintiff], entered into a proposed lease and a proposed option to purchase that building at 5-11 North Main Street." AR 105. Given DeStefano's position as mayor, the court found that, under the

_____

[3] When reviewing an agency action under the arbitrary and capricious standard, as here, "the focal point for judicial review should be the administrative record already in existence, not some new record made initially in the reviewing court." *Camp v. Pitts*, 411 U.S. 138, 142 (1973) (per curiam).

circumstances of that transaction, DeStefano "engaged in a prohibited conflict." AR 107. In other words, because DeStefano was the Mayor of Middletown, he was prohibited from participating *in his individual capacity* in a transaction involving a loan made in part using CDBG funds of some sort. Plaintiff, the court found, acted as DeStefano's *individual* lawyer in this transaction.

But the trial judge did not stop there and find the two guilty, because that was "not the entire analysis." AR 107. To violate the relevant state statute, the defendant's conduct "must be performed by the actor willfully and knowingly," which the court construed as meaning that "the evil motive must be fraught with activities which are incompatible with the paramount duty of a public official." AR 108. Applying that standard, the court found no "evil design under nefarious purpose." AR 109. As for Plaintiff in particular, the court found there was "no conspiracy with attorney Guertin." AR 109. Rather, the evidence showed Plaintiff was "in the room with [DeStefano and a third-party] "as they did the initial negotiation of this deal, made some changes and prepared the documents." AR 110. The court found that Plaintiff was aware of N.Y. General Municipal Law Section 801 — which prohibits public officials from "hav[ing] an interest in any contract with the municipality of which he is an officer or employee" — but that "it's not so clear on these facts where and to what extent the conflict lies." AR 110. The court said there was no evidence that Plaintiff "was seen in contact or consult [*sic*] or conversation with either of his two co-defendants at any time relevant to this case." AR 110–11. Given these facts, the court said it was "hard to discern the existence of a conspiracy." AR 111.

The court, however, went on to describe its view of Plaintiff's conduct as "ill advised" since:

> [A]ttorney Guertin did wear two hats. And in his zeal to represent his private client DeStefano, he was blinded to his obligation to the City of

Middletown and he should have exercised more due care in making the evaluation that I have been called upon to make in order to decide this case.

Whether he told DeStefano this could be a problem or was [a] problem, I don't know. And I will not speculate. It is not in the record. All I know [is Plaintiff] represented [DeStefano]. Lawyers don't become co-conspirators or aiders or abetters by giving legal advice unless there is some further demonstrable criminal plan, which I simply don't find here.

So Mr. Guertin did his job as attorney for a private citizen, DeStefano. Perhaps he didn't do his job quite as well as corporate counsel for the City of Middletown. You know, sometimes your nose will tell you something shouldn't be done and maybe the smell of this ought to have been enough to go another way.

But having said that I find as to the defendant Guertin that he lacked the necessary — that there is no evidence that he had reckless amount — that he knowingly, willfully, violated [the] statute. That he acted in a way co-conspiracy with defendant DeStefano. As to defendant Guertin, I find him not guilty.

AR 111–12.

Finally, the trial judge turned to DeStefano and stated that "if there was no conspiracy . . . those findings apply equally to defendant DeStefano insofar as it relates to the criminal charges on the [transaction]." AR 112. The court also discussed DeStefano's involvement in six other transactions, and found DeStefano not guilty of any criminal conduct related to them. AR 114. The court did find DeStefano guilty of two "reduced counts" of Offering a False Instrument for Filing," AR 124, but, as noted, the convictions on those two counts were overturned on appeal because the New York state appellate court found the evidence legally insufficient to support the convictions, *DeStefano*, 846 N.Y.S.2d at 376.

C. HUD's Reaction, and Novesky's Reinstatement and Request for Reimbursement

After his exoneration, Novesky was reinstated as the Director of the Office of Economic

and Community Development.  AR 76.  In a May 27, 2005 letter to the new mayor of

Middletown, HUD allowed Novesky's access to a HUD computer system to be restored.  AR 76.

In the same letter, HUD separately stated that, although DeStefano was found not guilty under

New York law, the verdict "establishes a violation of the conflict of interest" provision of HUD

regulations.  AR 77.  Therefore, HUD would "consider implementation of specific corrective or

remedial action" provided for by regulation.  AR 77.  This letter did not mention Plaintiff by

name.

     Over a year later, on August 18, 2006, Novesky's attorney, Otto Hetzel, wrote a letter to

an Associate General Counsel at HUD memorializing a previous informal conversation between

the two about the possibility of Middletown's using CDBG funds to reimburse Novesky for legal

fees he incurred "to defend against criminal allegations involving the administration of Federal

programs."  AR 54.  In the letter, Mr. Hetzel stated that he "came away from that [informal]

conversation understanding that you believe, as I do, that recipients of federal program funds

may expend such funds for this purpose."  AR 54.  Mr. Hetzel requested a "short

note . . . confirming the eligibility of CDBG funds for this type of payment."  AR 55.  There was

no immediate response to this letter from anyone at HUD.

     On March 20, 2007, Mr. Hetzel wrote a letter to two HUD officials making a more

formal request for HUD's authorization to use CDBG funds to reimburse Novesky.  AR 42.  Mr.

Hetzel stated that reimbursement was authorized by OMB Circular A-87, Attachment B, Item

10, which is called "Defense and prosecution of criminal and civil proceedings, and claims."  AR

42.  Subsection (b) of Item 10 states that "[l]egal expenses required in the administration of

Federal programs are allowable.  Legal expenses for prosecution of claims against the Federal

Government are unallowable."  AR 42.  Mr. Hetzel contended that, because Novesky was found

not guilty on all charges, and because the verdict showed Novesky was "performing work on behalf of the City under the CDBG program" during the transactions at issue, Middletown was authorized to reimburse Novesky for his defense costs using CDBG funds. AR 43.

On September 7, 2007, Elton Lester, HUD's Acting Associate General Counsel in the Office of Assisted Housing and Community Development, responded that Middletown could indeed use CDBG to reimburse Novesky's legal fees. AR 38. First, Lester confirmed that the issue was governed by the cost principles in OMB Circular A-87. AR 38. Lester stated that, "[a]s a general matter, [HUD] has taken the position that a recipient may use CDBG funds to pay reasonable legal expenses incurred in defense of lawsuits resulting from its administration of the CDBG program as long as the grantee has acted with due diligence in the administration of the program." AR 38. Lester then gave two sentences of reasoning for why Novesky could be reimbursed. "In this case," Lester wrote, "the proceedings resulted from actions undertaken in the ordinary course of the Director's employment and the court acquitted him all charges after a trial on the merits. Further, no CDBG funds financed the employee's defense during the proceedings." AR 38–39. Lester concluded that, "[u]nder these circumstances, [HUD] believe[d] the legal expenses would be required in the administration of the CDBG program for purposes of section 10.b [of the OMB Circular]." AR 39.

### D. Plaintiff's Unsuccessful Attempt at Reimbursement

On March 17, 2008, attorney Robert Isseks, representing Plaintiff and Mayor DeStefano, wrote to HUD requesting advice as to whether Middletown could reimburse his clients' legal fees using CDBG funds. AR 34. Unlike Novesky, who the record shows had pursued reimbursement with some diligence, this was the first sign that Plaintiff and DeStefano wished to be reimbursed by Middletown with federal funds. Mr. Isseks' letter stated that the criminal

10

allegations against Plaintiff and Mayor DeStefano "involved the same 'administration of Federal programs' that gave rise to the criminal allegations against Mr. Novesky." AR 34 (quoting the Letter from Mr. Lester to Mr. Hetzel of September 7, 2007). Because Plaintiff and DeStefano were, like Novesky, found not guilty on all charges, they were "identically situated with Novesky." AR 35. Both DeStefano and Plaintiff, argued Isseks, "played integral roles in the administration of the subject HUD loans and thus, like Mr. Novesky, the 'reasonable legal expenses' incurred by Mr. DeStefano and Mr. Guertin were in the defense of criminal charges that 'resulted from actions undertaken in the ordinary course of [their] employment.'" AR 35 (alteration in original) (quoting the Letter from Mr. Lester to Mr. Hetzel of September 7, 2007). Mr. Isseks then listed Plaintiff's regular duties as Middletown's Corporation Counsel, which included various tasks related to the administration of HUD funds. AR 35–36.

On June 12, 2008, Lester responded to the letter and denied the request for reimbursement. AR 25. The letter began by acknowledging that HUD had authorized reimbursement for Novesky and then restated the language of OMB Circular A-87. AR 25. But, after quoting Isseks' description of his clients' daily responsibilities, Lester stated that those official activities "did not serve as the basis for the criminal proceedings brought against" Plaintiff and DeStefano. AR 26. Rather, "[w]hile the alleged misconduct leading to the court proceedings occurred during Mr. DeStefano's tenure as mayor, his actions were of a personal nature." AR 26. Then, turning specifically to the reasons for denying the request with respect to Plaintiff, Lester stated:

> [T]he court documents described Mr. Guertin's questioned activities as
> being undertaken for the mayor's personal benefit as opposed to providing
> legal services to carry out the city's CDBG program. The court presiding
> over the case stated "attorney Guertin did wear two hats. And in his zeal
> to represent his private client DeStefano, he was blinded to his obligation

to the City of Middletown. . . . So[,] Mr. Guertin did his job as attorney for a private citizen, DeStefano."  In our view, legal expenses arising from a mayor's private business dealings, as well as those arising from advising the mayor on such matters, are not required in the city's administration of the CDBG program.

AR 26 (quoting the state verdict, AR 111).

For the next several years, Mr. Isseks took a number of steps to get HUD to reconsider its denial.  He wrote back to Lester requesting a "final determination from an appropriate official," though he acknowledged there was "no appeal process *per se*."  AR 23.  He wrote a letter to another HUD official requesting reconsideration.  AR 18–21.  He wrote to the congressional Representative who represented the citizens of Middletown, and in turn that Representative wrote to HUD about the matter.  AR 15–16.  The City Council of Middletown even passed a Resolution declaring "that there is no rational basis in law or fact to reimburse Mr. Novesky but not Mr. Guertin, for the criminal defense legal expenses incurred" — and then the city sent the Resolution to HUD.  AR 11–13.

The efforts proved fruitless.  On February 9, 2011, Yolanda Chávez, HUD's Deputy Assistant Secretary for Grant Programs, responded in separate letters to Mr. Isseks and to the City of Middletown.  AR 2, 4.  While Ms. Chávez was "sorry that [Isseks] and the City of Middletown [were] dissatisfied with HUD's decision in this matter," the Department "considers this matter closed."  AR 2, 4.  According to HUD, Middletown could not pay Plaintiff's legal fees using federal CDBG funds.

E. This lawsuit

After concluding his dealings with HUD, Plaintiff filed the instant Complaint in this Court.  Plaintiff established jurisdiction under the Administrative Procedure Act, 5 U.S.C. § 704 ("APA"), which provides that a "final agency action for which there is no other adequate remedy

in a court [is] subject to judicial review," and he also invokes 28 U.S.C. §§ 1331, 1343, and

1361, which provide for general federal question jurisdiction, jurisdiction over civil rights claims

and actions to compel agency action.[4]  The Complaint alleges that HUD's "refusal to authorize

the City of Middletown to reimburse plaintiff's legal expenses out of the administrative funds of

the City's Community Development Office . . . is arbitrary, capricious, and without any rational

basis and in violation of plaintiff's rights to due process and equal protection."  (Compl. ¶ 24.)

Plaintiff requests that this Court order HUD to authorize Middletown to reimburse him.  (Compl.

¶ A).

No discovery was requested, and such a request would have been irrelevant anyway;

when a court's review is confined to determining whether an agency action was arbitrary or

---

[4] HUD challenges neither the Court's jurisdiction nor Plaintiff's standing to bring this suit.  Exercising its independent duty to verify these matters, the Court notes that HUD's determination was clearly a "final agency action" that confers jurisdiction under the APA.  *See Sackett v. EPA*, 132 S. Ct. 1367, 1371 (2012) (describing the "hallmarks of APA finality" as, among other things, that the agency action "determined rights or obligations" and that it "marks the consummation of the agency's decisionmaking process" (internal quotation marks omitted)).

Standing is a somewhat trickier matter.  As an irreducible constitutional minimum, "a litigant must demonstrate that it has suffered a concrete and particularized injury that is either actual or imminent, that the injury is fairly traceable to the defendant, and that it is likely that a favorable decision will redress that injury."  *Massachusetts v. EPA*, 549 U.S. 497, 517 (2007).  Here, because Middletown surely *could* pay for Plaintiff's legal fees, even absent use of CDBG funding, there is some amount of attenuation between HUD's denial and Plaintiff's failure to be reimbursed.  After all, Middletown could just pay Plaintiff out of its non-federal funds.  Still, it is clear from the record — especially the City Council resolution declaring that HUD should authorize reimbursement with CDBG funds, *see* AR 12 — that Middletown would reimburse Plaintiff if it could do so with federal funds, but it will not do so if it does not receive the funds.  This means that Plaintiff does indeed meet the requirements of injury, causation, and redressability: whether Plaintiff gets reimbursed turns on HUD's determination.  *See Carver v. City of New York*, 621 F.3d 221, 226 (2d Cir. 2010) (noting that a defendant's actions need not be "the very last step in the chain of causation to demonstrate that the defendant's actions caused the claimed injury," because "[i]t suffices that the defendant's actions had a determinative or coercive effect upon the action of someone else who directly caused the claimed injury" (internal quotation marks omitted)).  That gives Plaintiff standing to challenge HUD's decision.

capricious, "the focal point for judicial review should be the administrative record already in existence, not some new record made initially in the reviewing court." *Camp*, 411 U.S. at 142; *see also Yale-New Haven Hosp. v. Leavitt*, 470 F.3d 71, 82 (2d Cir. 2006) ("Generally speaking, after-the-fact rationalization for agency action is disfavored."). Thus, based on the administrative record, the parties cross-moved for summary judgment. The Court held oral argument on December 6, 2012.

## II. Discussion

The central challenge here comes under the Administrative Procedure Act. That is, the Court must determine whether HUD's determination that Middletown could not use CDBG funds to reimburse Plaintiff was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," such that this Court must "hold unlawful and set aside" the relevant agency action, according to 5 U.S.C. § 706(2)(A). That is a high standard for Plaintiff, and the Court concludes that Plaintiff has not met it here. Moreover, as explained in the final subsection, the resolution of the APA claim also necessarily disposes of Plaintiff's attendant equal protection claim.

### A. HUD's Determination Was Not Arbitrary and Capricious

#### 1. The legal standard

The Parties agree that the "catchall" provision of the APA, 5 U.S.C. § 706(2)(A), provides the relevant standard of review for this Court. That provision, which "pick[s] up administrative misconduct not covered by the other more specific paragraphs" of the APA, *see Ass'n of Data Processing Serv. Orgs., Inc. v. Bd. of Governors of the Fed. Reserve Sys.*, 745 F.2d 677, 683 (D.C. Cir. 1984) (Scalia, J.), states that a "reviewing court shall . . . hold unlawful and set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse

of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).

While the exact degree of deference courts are to give an agency under this standard has been dissected in countless decisions since the APA was enacted in 1946, the canonical formulation of arbitrary and capricious review comes from the Supreme Court's 1983 decision in *Motor Vehicle Manufacturers Ass'n of the United States, Inc. v. State Farm Mutual Automobile Insurance Co.*, 463 U.S. 29 (1983). There, the Court, drawing on language from decades of its prior decisions, stated:

> The scope of review under the "arbitrary and capricious" standard is narrow and a court is not to substitute its judgment for that of the agency. Nevertheless, the agency must examine the relevant data and articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made. In reviewing that explanation, we must consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment. Normally, an agency rule would be arbitrary and capricious if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise. The reviewing court should not attempt itself to make up for such deficiencies: We may not supply a reasoned basis for the agency's action that the agency itself has not given. We will, however, uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned.

*Id.* at 43 (internal quotation marks and citations omitted). Though *State Farm* was decided in the context of agency rulemaking, the Supreme Court later added that "adjudication is subject to the requirement of reasoned decisionmaking as well." *Allentown Mack Sales & Serv., Inc. v. NLRB*, 522 U.S. 359, 374 (1998); *see also New England Health Care Emps. Union v. NLRB*, 448 F.3d 189, 194 (2d Cir. 2006) (applying *State Farm* to an agency adjudication). That formulation thus applies here.

As *State Farm* makes clear, and as the Second Circuit has subsequently elaborated,

arbitrary and capricious review requires courts to conduct a "searching and careful" review of the administrative record, *Islander E. Pipeline Co., LLC v. McCarthy*, 525 F.3d 141, 151 (2d Cir. 2008) — but only to ensure that "the agency has considered the evidence, examined the relevant factors, and spelled out a satisfactory rationale for its action including the demonstration of a reasoned connection between the facts it found and the choice it made," *Envtl. Def. v. EPA*, 369 F.3d 193, 201 (2d Cir. 2004). If a court finds that the agency has acted within its scope of authority, considered relevant evidence, and provided a sound reason for its decision, the agency determination must be upheld, for a reviewing court "may not substitute its judgment for that of the agency." *Natural Res. Def. Council v. EPA*, 658 F.3d 200, 215 (2d Cir. 2011) (internal quotation marks omitted); *see also Mullins v. City of New York*, 653 F.3d 104, 114 (2d Cir. 2011) (explaining that an agency's interpretation of its own regulation is entitled "to controlling deference . . . unless it is plainly erroneous or inconsistent with the regulations or there is any other reason to suspect that the interpretation does not reflect the agency's fair and considered judgment on the matter in question" (internal quotation marks and brackets omitted)).

### 2. HUD's determination

Plaintiff contends that HUD's determination must be set aside because HUD "misstated the reason why Guertin was indicted." (Pl. Mem. 6.) The Lester Letter denying Plaintiff reimbursement reasoned that the conduct at issue did not arise out of Guertin's administration of the federal program because "court documents described Mr. Guertin's questioned activities as being undertaken for the mayor's personal benefit as opposed to providing legal services to carry out the city's CDBG program." AR 26. But, counters Plaintiff, "even if the trial judge did say that Guertin 'did his job as attorney for a private citizen,' that is not what Guertin was indicted for. He was indicted on the mistaken belief that he had done something wrong as the attorney

for the City in the course of his administration of the City's CDBG program."  (Pl. Mem. 7.)
Given the nature of the indictment, and since Plaintiff — like Novesky — was found not guilty
on all charges, "Novesky and Guertin are identically situated under section 10.b [of the OMB
Circular] and HUD's attempt to distinguish [Novesky and Plaintiff] is arbitrary and capricious."
(Pl. Mem. 8.)

Plaintiff's argument is intuitively appealing.  After all, Plaintiff and Novesky were
charged by the same charging instrument as part of the same public corruption conspiracy.  *See*
AR 126–149.  And the charges themselves certainly do appear to arise, at first glance, from their
combined administration of the federal program.

For example, take Count 41.  That Count charged that Plaintiff, Novesky, and DeStefano,
"acting individually and in concert with each other, with intent to obtain a benefit or deprive
another person of a benefit, did commit an act relating to their offices but which constituted an
unauthorized exercise of their official functions, knowing that such act was unauthorized."  AR
141.  How, Plaintiff essentially asks, can an indictment for official misconduct where the
Plaintiff was found not guilty *not* be a prosecution that "resulted from actions undertaken in the
ordinary course of [his] employment," as required by HUD?  *See* AR 38–39.  In Plaintiff's
words, he was "not indicted for the advice he gave to the mayor on the mayor's private business
dealings."  (Pl. Reply 2.)  Rather, Plaintiff "was indicted for his role, as the City's Corporation
Counsel, in the administration of the CDBG program."  (Pl. Reply 2.)  Those statements are
unimpeachably correct, based on the language of the indictment.

Yet HUD rejected Plaintiff's proposition that the prosecution "resulted from actions
undertaken in the ordinary course of [his] employment."  In denying Plaintiff's request, HUD
looked past the indictment and to the actual facts as found by the trial judge.  AR 26.  Quoting

17

the state court verdict that Plaintiff "did his job as attorney for a private citizen, DeStefano," HUD concluded that, despite the language in the indictment, the prosecution of Plaintiff did *not* arise from the ordinary course of administering the CDBG program for the City of Middletown. AR 26. Rather, it arose from his actions undertaken as a private citizen. It is incontestable that those actions should not have been taken, since Plaintiff was a government official; hence the indictment. By contrast, Novesky was prosecuted *solely* for doing his job. AR 38–39. He was completely cleared of wrongdoing while doing his job.

Providing reimbursement for Novesky but not Plaintiff and DeStefano is therefore a rational, non-arbitrary distinction, and it is supported by the evidence that HUD used in deciding the facts relevant to its decisionmaking. Another, perhaps simpler, way of articulating HUD's distinction is the following.

Recall again that Plaintiff and Novesky were both indicted for "commit[ting] an act relating to their offices but which constituted an unauthorized exercise of the official functions, knowing that such act was unauthorized." There are at least two ways to defend against such a charge. According to HUD, which defense is employed makes all the difference.

The first, perhaps more immediately apparent defense is to say either "I didn't know the act was unauthorized" or "The act wasn't unauthorized given my function." This first sort of defense was Novesky's: the judge found Novesky was just "doing his job," and therefore not knowingly doing any unauthorized acts. AR 100. The second defense, though, negates a different element of the charge: the element which required Plaintiff and Novesky to commit an act "relating to their offices." A defendant employing this defense says "The act wasn't an act relating to my office." Plaintiff successfully employed this second sort of defense: with regard

to the acts at issue, the judge found that Plaintiff "did his job *as attorney for a private citizen*," and thus was not guilty of *official* misconduct. AR 112.

The existence of these different defenses means that HUD may draw a non-arbitrary line between those employing defense one and those employing defense two. According to HUD, that difference is the difference between being eligible for reimbursement and being ineligible for it, since those employing defense one defend a suit "resulting from its administration of the [federal] program," but those who employ defense two do not. It is not for this Court to say whether that is the best possible line to draw under the relevant regulation. Rather, the Court must simply ask whether that line and the adjudication that Novesky fell on one side of it, and that Plaintiff fell on the other, was the result of "reasoned decisionmaking." *State Farm*, 463 U.S. at 52. The Court concludes that it was, for several reasons.

First, HUD's determination that Novesky and Plaintiff were differently situated did not come as a surprise or a change of position; rather, HUD's reasoning was consistent throughout all the correspondence available in the administrative record. The first correspondence in the record from HUD is a May 27, 2005 letter to the Mayor of Middletown, where HUD allowed Novesky's access to a HUD computer system to be restored after he was reinstated to his prior position. AR 76. In the same letter, though, HUD stated that it would "consider implementation of specific corrective or remedial action" against DeStefano, since the court did find that he "engaged in a prohibited conflict of interest." AR 76. Although Plaintiff was not identified by name in that letter, the HUD official noted that DeStefano had acted "with the advice of his attorney" — clearly a reference to Plaintiff. AR 76. Moreover, in an August 2006 letter, Novesky's attorney stated that he was told in informal conversations with HUD officials that reimbursement for legal fees would be available from CDBG funds. AR 54. This prior

statement provides a firm footing for HUD: as the Supreme Court said in *State Farm*, "[a] settled course of behavior embodies the agency's informed judgment that, by pursuing that course, it will carry out the policies committed to it by Congress. There is, then, at least a presumption that those policies will be carried out best if the settled rule is adhered to." *State Farm*, 463 U.S. at 41–42 (internal quotation marks omitted).

Second, HUD stated, and Plaintiff does not dispute, that the precise distinction invoked here has been a longstanding line of demarcation for HUD. Lester, in his letter to Novesky, wrote that HUD "has taken the position that a recipient may use CDBG funds to pay reasonable legal expenses incurred in defense of lawsuits resulting from its administration of the CDBG program as long as the grantee has acted with due diligence in the administration of the program." AR 38. Though Lester did not cite any prior examples or cases, Plaintiff does not challenge that this has, in fact, been HUD's longstanding interpretation of the relevant regulations — the challenge is only that HUD's application of law to fact was arbitrary and capricious. (*See* Pl. Mem. 1–8, Pl. Reply Mem. 6–8.) Indeed, while HUD argues in its moving papers that HUD's legal interpretation of Section 10.b of Attachment B to OMB Circular A-87 is entitled to deference, the Court need not express an opinion on the level of deference owed by this Court to HUD's legal interpretation.[5] It is enough to say that the legal principle HUD

_____

[5] In the Administrative Record, there is an example of an earlier HUD letter using virtually identical language as that used by Lester in his letters. In a 1995 letter to the City Attorney of Houston, HUD's Deputy Assistant Secretary for Grant Programs stated that "CDBG funds may be used to pay legal fees incurred in defense of lawsuits resulting from its administration of the CDBG program as long as the grantee has acted with due diligence in the administration of t he program." AR 161. While HUD has not brought to the Court's attention any HUD determination regarding fees following a finding that an exonerated defendant had acted with a conflict of interest, as here, that letter nonetheless shows that HUD's legal position has indeed been consistent over at least the last 17 years.

applied had been its longstanding policy, and that its application to the facts here was not arbitrary or capricious. This again confirms that HUD followed the principle of regularity of decisionmaking. *See Allentown Mack*, 522 U.S. at 374 ("It is hard to imagine a more violent breach of [the requirement of reasoned decisionmaking] than applying a rule of primary conduct or a standard of proof which is in fact different from the rule or standard formally announced.").

Third and finally, HUD's factfinding methodology was sound. HUD relied on the verdict transcript to determine the nature of the criminal action, which was an eminently reasonable place to look to find the necessary facts. Plaintiff vigorously disputes the factual findings themselves. "The trial court did not find that Guertin had a conflict of interest," Plaintiff contends in the heading to Point 3 of his reply memorandum. (Pl. Reply Mem. 5.) But the argument in this section of the memorandum, like all others in his memoranda, amounts to a differing interpretation of the trial judge's verdict from that taken by HUD. One perhaps could debate HUD's interpretation of the facts underlying the verdict, but the only role for this Court is make sure that HUD meets the requirement that the agency "examine the relevant data and articulate [a] satisfactory explanation for its action." *State Farm*, 463 U.S. at 43. The relevant data — the verdict — was examined, and HUD offered a satisfactory explanation for HUD's subsequent action. That ends this Court's review.[6]

---

[6] At oral argument, counsel for HUD appeared to walk back somewhat from defending HUD's determination on the basis of the particular rationale given by Mr. Lester in his letter. Several times, counsel for HUD said that Lester's letter "perhaps could have been worded differently." The problem with this argument is that, as stated above, *State Farm* tells reviewing courts that they "may not supply a reasoned basis for the agency's action that the agency itself has not given." 463 U.S. at 43.

Nonetheless, HUD's memoranda of law do indeed defend Lester's letter on the basis of the specific rationale stated in the letter, (*see* HUD Opening Mem. 18–22), and the Court does not construe counsel's representations at oral argument as abandoning the position in HUD's memoranda of law. Ultimately, the Court today holds that HUD's decisionmaking, in the form

To be sure, HUD perhaps *could* have relied solely on the indictment to determine the nature of the action, and a reasoned decision to allow Middletown to reimburse Plaintiff may well also have withstood arbitrary and capricious review.  That is the nature of agency decisionmaking: an agency can often choose between more than one viable option.  But our system puts that judgment in the hands of the agency, not the federal courts.  Thus, when an agency chooses one of those viable options after relying on a perfectly reasonable source to make its factual determinations — as here — then the action must be upheld.  This is because, as noted, a reviewing court "may not substitute its judgment for that of the agency."  *Natural Res. Def. Council*, 658 F.3d at 215 (internal quotation marks omitted).

\* \* \*

At bottom, to survive arbitrary and capricious review, "an agency's decreed result [must] be within the scope of its lawful authority," and "the process by which it reaches that result must be logical and rational."  *Allentown Mack*, 522 U.S. at 374.  Here, there is no dispute that the agency had the authority to adjudicate this dispute and deny Middletown the authority to reimburse Plaintiff.  Moreover, HUD's decisionmaking process was logical and rational, as shown by its consistent position regarding this case through time, its explanation of its determination in the Lester Letters, and its reasonable reliance on the verdict transcript to determine the relevant facts.  That is enough for the Court to confirm that HUD's action was not "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  5 U.S.C. § 706(2)(A).

of the Lester denial letter, was not arbitrary and capricious based on its stated rationale.

B. HUD's Determination Did Not Violate Plaintiff's Equal Protection Rights

Plaintiff also presses a so-called "class of one" equal protection claim under the Fifth Amendment's equal protection component.[7] As the Supreme Court recently stated, "[w]hen those who appear similarly situated are nevertheless treated differently, the Equal Protection Clause requires at least a rational reason for the difference, to assure that all persons subject to legislation or regulation are indeed being treated alike, under like circumstances and conditions." *Engquist v. Or. Dept. of Agr.*, 553 U.S. 591, 602 (2008) (internal quotation marks omitted). Therefore, "when it appears that an individual is being singled out by the government, the specter of arbitrary classification is fairly raised, and the Equal Protection Clause requires a rational basis for the difference in treatment." *Id.* (internal quotation marks omitted). In other words, to prevail on such a claim, a plaintiff is "required to show . . . irrational and wholly arbitrary acts." *Giordano v. City of New York*, 274 F.3d 740, 751 (2d Cir. 2001) (internal quotation marks omitted).

As explained above, HUD's classification was not "wholly arbitrary" or "irrational." To the contrary: HUD's reliance on the state judge's disparate findings as to Novesky on the one hand and Plaintiff and DeStefano on the other provided a rational, non-arbitrary basis for the

---

[7] The Fifth Amendment, which applies to actions against the federal government, does not have an explicit Equal Protection Clause like that in the Fourteenth Amendment. Nonetheless, "[e]qual protection analysis in the Fifth Amendment area is the same as that under the Fourteenth Amendment." *Buckley v. Valeo*, 424 U.S. 1, 93 (1976) (per curiam); *see also United States v. Laurent*, 861 F. Supp. 2d 71, 105 (E.D.N.Y. 2011). The Complaint here technically invokes the Fourteenth Amendment, but, with HUD's consent, (*see* HUD Opening Mem. 14 n.4), the Court construes the Complaint as stating a Fifth Amendment equal protection claim, and the Court applies the same standard as that which applies under the Fourteenth Amendment's Equal Protection Clause.

difference in treatment.  Therefore, Plaintiff's equal protection claim also fails.[8]

III. Conclusion

For the reasons stated above, HUD's cross-motion for summary judgment is granted, (Dkt. No. 17), and Plaintiff's motion for summary judgment, (Dkt. No. 10), is denied.  The Clerk is respectfully requested to terminate the pending motions and close the case.

SO ORDERED.

Dated:    White Plains, New York
          December __, 2012

_____
KENNETH M. KARAS
UNITED STATES DISTRICT JUDGE

---

[8] In the Complaint, Plaintiff also contended that his "due process" rights were violated. (Compl. ¶ A.)  But he does not mention the due process claim in his moving papers either in support of or in opposition to summary judgment, and he did not raise the issue at oral argument, so the Court deems the claim abandoned.  *See, e.g.*, *Singleton v. City of Newburgh*, 1 F. Supp. 2d 306, 312 (S.D.N.Y. 1998) (deeming a claim abandoned where the claim was alleged in the complaint but not "raised elsewhere in the record").

difference in treatment. Therefore, Plaintiff's equal protection claim also fails.[8]

### III. Conclusion

For the reasons stated above, HUD's cross-motion for summary judgment is granted,

(Dkt. No. 17), and Plaintiff's motion for summary judgment, (Dkt. No. 10), is denied. The Clerk

is respectfully requested to terminate the pending motions and close the case.

SO ORDERED.

Dated:    White Plains, New York
         December 21, 2012

                                              KENNETH M. KARAS
                                         UNITED STATES DISTRICT JUDGE

---

[8] In the Complaint, Plaintiff also contended that his "due process" rights were violated. (Compl. ¶ A.) But he does not mention the due process claim in his moving papers either in support of or in opposition to summary judgment, and he did not raise the issue at oral argument, so the Court deems the claim abandoned. *See, e.g.*, *Singleton v. City of Newburgh*, 1 F. Supp. 2d 306, 312 (S.D.N.Y. 1998) (deeming a claim abandoned where the claim was alleged in the complaint but not "raised elsewhere in the record").

Service List

Robert Nathan Isseks
Robert N. Isseks
6 North Street
Middletown, NY 10940

Michael J. Byars
U.S. Attorney's Office, SDNY (Chambers Street)
86 Chambers Street
New York, NY 10007